

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**JUN 0 4 1999**

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| CYNTHIA RODRIGUEZ, JOVITA A. URRUTIA, BEATRIZ HUERTA AND ANTHONY HEFNER | § § § § § | |
| VS. | § § § | CIVIL ACTION NO. B-98-085 |
| VICENTE RAMIREZ, BURNS INTERNATIONAL, INC., UNITED INVESTIGATIVE SERVICES, AND U.S. IMMIGRATION AND NATURALIZATION SERVICES | § § § § § | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' LATEST MOTIONS FOR SUMMARY JUDGMENT

TO THE HONORABLE COURT:

COME NOW Cynthia Rodriguez, Jovita A. Urrutia, Beatriz Huerta and Anthony Hefner,

Plaintiffs, and respond as follows:

## BACKGROUND FACTUAL ALLEGATIONS

1- <u>The Allegations of Reverend Anthony Hefner</u>

Reverend Hefner was a guard employed at the Bayview Detention Center by Defendant

Burns International, Inc. (Burns). Hefner had previously won an EEOC case against Burns and had

a written settlement agreement with Burns (Exhibit A). Reverend Hefner, as might be surmised from

his religious focus, was an individual who cared about other people and tried to help others. The

Bayview Detention Center is not a facility which houses criminals, rather it is a facility which

typically holds oppressed persons from other nations whose right to be in the United States is at

---

CHJPDF - www.fineto.com

issue. In the particular period of time covered by this lawsuit, a majority of Bayview Detention Center detainees were persons from war-torn Central America who were in the United States as refugee claimants. Such individuals, by federal law and policy, were supposed to be treated with dignity while in the United States (See, for example, United States Department of Justice "Officers' Handbook - A Guide for Proper Conduct and Relationships with Aliens and the General Public," Rev 1990, p.8). Even convicted prisoners in federal prisons, however, are specifically entitled to statutory and constitutional rights. Clearly, immigrant detainees were entitled to *at least those rights* accorded convicted felons, and, from the perspective of the furtherance of the foreign policy of the United States, ought to have been treated in an exemplary fashion. Reverend Hefner, a very experienced guard, knew that immigrant detainees had to be treated, at a minimum, in conformity with federal law.

What Hefner observed, however, was the sexual exploitation of female detainees, something he complained about repeatedly (one was a minor female held in violation of Part 242.24 of INS CFR Rules). Hefner also observed that when those female detainees who were more sophisticated complained about sexual exploitation, they were immediately shipped back to their own country where each would be powerless. Hefner also became the focal point for sexual exploitation complaints being then made by Burns' female guards (some fifteen in number, including Plaintiffs), and Hefner also tried to help those guards.

While the Bayview Detention Center is run by the Immigration and Naturalization Service, the Service has historically hired independent contractors like Defendants Burns and UIIS, to manage immigrant detainees at federal installations like Bayview. Such practice was apparently motivated

by the INS belief that such an approach was cost-effective.

At some point the Bayview guard contract held by Burns was to expire and, as required by federal law, bids were taken on a new guard contract. Defendant UIIS's bid was subsequently selected. As was the custom and practice in such situations, UIIS offered positions to the Burns' guards. Generally speaking, such a hiring practice is mutually advantageous to both the incoming and outgoing guard companies. The incoming company (typically an out-of-state business with no local employees) needs experienced, local guards while the outgoing guard company typically wants its guards to be hired so as to minimize possible unemployment insurance claim costs. Not surprisingly, therefore all Plaintiffs were initially hired directly by UIIS, were fitted for uniforms, and were required to attend UIIS company policy seminars.

At this point, however, Burns supervisors (who themselves would soon be working for UIIS) and who did not want to have a civil rights advocate like Reverend Hefner working at the camp, talked to UIIS upper management who had already hired Plaintiffs, and convinced such UIIS upper management to fire all Plaintiffs except Beatriz Huerta (an attractive female guard who was apparently an ongoing harassment fantasy). An INS "deep throat" provided Hefner with an actual "blacklist" of Plaintiffs.

2-    Claims of Jovita Urrutia

Urrutia had filed claims of sexual harassment against Burns' supervisors, however, the incidents were one-on-one encounters which the EEOC was not, because of such one-on-one nature, able to substantiate to the degree EEOC policies mandated. Urrutia had also often complained about the exploitation of female detainees, identifying with their sexual harassment plight. After being

---

hired by UIIS, fitted for a uniform, and after attending UIIS company seminars, Urrutia too was terminated by UIIS. Such termination was clearly motivated by the desire of Burns' supervisors, who would be working for UIIS, to get rid of women who had filed EEOC or detainee complaints against the same supervisors. If *Burns* had fired Urrutia, Urrutia would clearly have had Title VII causes of action against Burns. However, Burns could not and therefore did not, fire Urrutia, (or any other Plaintiff) since Plaintiffs' jobs with Burns terminated automatically when the Burns' contract ran out at Bayview. Instead, what happened was that Burns' supervisors convinced UIIS, upper management, who had just hired all Plaintiffs, to fire all but Plaintiff Huerta.

3-    Claims of Cynthia Rodriguez

Like Urrutia, Rodriguez had complained about the sexual exploitation of female detainees (e.g. See Exhibit B), and, like Urrutia, had unsuccessfully pursued EEOC complaints of personal sexual harassment, and, like Urrutia and Hefner, Rodriguez had been hired by UIIS and then immediately fired owing to the intervention of Burns' supervisors.

4-    Claims of Beatriz Huerta

Plaintiff Huerta, who had not been as involved (personally, or as a detainee advocate) as the other Plaintiffs, was also hired by UIIS, but unlike the other Plaintiffs, was not then immediately fired by UIIS. Huerta's principal complaint was that she, along with all other UIIS hirees, had been promised health insurance coverage by UIIS, which coverage was to include maternity benefits. Huerta was given a UIIS health insurance coverage booklet (previously submitted as summary judgment evidence). During her employment with UIIS Huerta became pregnant and told her health care providers that she had UIIS health insurance. The providers, however, discovered that no such

coverages existed. Accordingly, Huerta was forced to pay all of the childbirth medicals herself. To add insult to injury, Huerta was then fired in obvious response to her complaints about the missing health insurance.

## RELEVANT LITIGATION HISTORY

5-      <u>Defendants' Prior Summary Judgment Attempts</u>

The Defendants' first summary judgment motion was granted by Judge Hester. Judge Hester stated, however, that he did so as to avoid the possibility of a second trial. Judge Hester stated that in the Court's view it would be wasteful to try some of the issues and then have Plaintiffs later prevail on some of the dismissed issues (through the appellate process) and then be forced to have a second trial on issues successfully appealed. Indeed, the result of the appeal of the total dismissal was this instant lawsuit, a lawsuit in which all viable issues will hopefully be resolved.

In response to the Court of Appeal's decision reinstating this case, Defendants, predictably, then filed further summary judgment motions with the hope that the case would, in its entirety, be finally dismissed. Those motions were heard by Judge Euresti who, with one minor exception, denied such motions. Defendants now regurgitate those state court motions here, hoping for a different result.

6-      <u>Removal to Federal Court</u>

Defendants' counsel (for UIIS, Burns, and Ramirez) eventually sought to add the INS as a cross-defendant and made a motion to that effect in state court. Such counsel, in soliciting Plaintiffs' counsel's non-opposition to such motion (the granting of the motion to add the INS was known to inevitably lead to removal to federal court) stated that such Defendants believed that they could show

that the INS was involved in the wrongful firing of Hefner, Urrutia and Rodriguez. Plaintiffs'

counsel agreed to not oppose the motion to add the INS (because of such allegations of provable INS

involvement) provided that if, after removal, the INS was, for whatever reason, dismissed from the

lawsuit, that the case would be remanded to state court.

## INCORPORATION OF PLAINTIFFS' PRIOR RESPONSES

7-      Plaintiffs incorporate, by reference, all prior summary judgment responses and evidence

submitted thereto.[1]

## THE SUBSTANCE OF THE LATEST SUMMARY JUDGMENT MOTIONS

8-      "Second Verse, Same as the First" (from the traditional English ballad).

### a)      UIIS Motion For Summary Judgment

*Preemption*: Once again, UIIS regurgitates the motion that it earlier filed and which was

rejected by Judge Euresti. First, UIIS asserts (citing Title VII cases such as *Stinnett v. Williamson*

*County Sheriff's Department*, 858 SW 2d 573, 577 (Tex. App-Austin 1993), writ denied, *Vincent*

*v. West Texas State University*, 895 SW 2d 469 (Tex. App.-Amarillo 1995), no writ, and *Cannizzara*

*v. Nieman Marcus, Inc.*, 979 (F. Supp 465 N.D. Tex. 1997) for the proposition that " . . . federal and

state civil rights statutes provide the exclusive basis for the alleged wrongful acts underlying

Plaintiffs' conspiracy claim . . ."

As Plaintiffs, however, have noted in their many summary judgment responses, each (except

---

[1]Plaintiffs' affidavits have previously clarified and rebutted the depostion materials
attached by UIIS to its motions for summary judgment. Similarly, Plaintiffs have previously
addressed the argument that the deposition evidence is conclusive. It is not. Summary Judgment
is not a war to be ended on submitted evidence. At best, apparently conflicting testimony would
go to the weight given Plaintiffs' testimony at trial.

---

Huerta) claim that one of the reasons each was fired, was because each had tried to intervene on behalf of female detainees who were being sexually exploited or otherwise abused[2]. Plaintiffs can find no case that holds that Title VII covers employees fired or otherwise discriminated against because such employees *tried to protect third party federal detainees*. In the five years that Defendants have been confronted with this challenge, as shown by the record, Defendants have not found such case. The reason is, of course, simple. Title VII prevents discrimination based on sex, national origin, race, or religion and, at best, addresses the harassment complaint process only vis a vis complaints concerning *such delineated discrimination areas*. A reading of the legislative history of this civil rights act reveals that Congress did not ever consider writing provisions into Title VII making it unlawful to fire or not hire employees who complain about *the violation of the civil rights of federal immigration detainees*.

Additionally, with respect to the collateral claim issue of the sexual harassment of Plaintiffs Urrutia and Rodriguez, while it *is* true that such harassment *is* addressed in Title VII, however, what is equally true is that Title VII only addresses *retaliation* claims with respect to sexual harassment complaints (and other Title VII-addressed discrimination forms). Retaliation is a readily defined concept: "A" does something bad to "B", and "B" thereafter tries to get even by doing something bad to "A" (i.e., "retaliates"). The sexual harassment of these Plaintiffs all happened while Plaintiffs were Burns' employees and their EEOC complaints were against Burns, not UIIS. It would therefore have been impossible for UIIS to "retaliate" against Plaintiffs since Plaintiffs never did anything

---

[2] One minor female detainee was coerced into performing a highly provocative Lambada dance; another female detainee, with a green substance oozing out of her mouth, was viciously kicked by a guard in an attempt to get the detainee up. Such female detainee was found dead the following day.

against UIIS, e.g., file EEOC complaints against UIIS. Had Plaintiffs actually commenced their employment at UIIS, then filed EEOC complaints against UIIS, and then been terminated, with respect to those claims harassment and related retaliation claims, clearly Title VII would be the exclusive remedy *for such claims*. However, as Plaintiffs have stated in summary judgment responses before, that is not what is alleged by Plaintiffs to have happened here, and Defendants citing any of any "preemption" cases which everyone knows exist in copious number, is a superfluous exercise.

***Conspiracy:***   Again, as Plaintiffs have repeatedly noted beforehand, no one disputes that a tenet of "conspiracy" jurisprudence is that there must be at least two parties to "conspire". And no one, particularly in light of the United States Supreme Court's famed decision in *Copperweld*, disputes the idea that an entity cannot "conspire" with itself, nor that corporate subsidiaries or affiliates are not separate entities for the purposes of "conspiring". Plaintiffs have said, and continue to say, however, that Defendants, Burns and UIIS were not related entities, rather were competitors and thus were "two or more parties" within the definitional parameters of "conspiracy". If Burns and UIIS were related entities, certainly there is no record of that in this case.

***Tortious Interference:***   UIIS additionally claims (citing *John Masek Corp. v. Davis*, 848 SW 2d 170, 175 (Tex. App.-Houston 1992, writ denied) that an entity cannot "interfere with is own contract". (UIIS Brief p.8). Plaintiffs, however, clearly do not dispute *that* statement of law. What Plaintiffs do dispute is the casuistry which follows, namely that "Plaintiffs can therefore not prove an essential element of a civil conspiracy claim, i.e. that two or more persons agreed to accomplish some unlawful objective" UIIS Brief, p.8). First, an agreement to achieve a legitimate, otherwise

lawful objective, is yet an illegal conspiracy, notwithstanding the otherwise "legitimate" goal, if such goal is sought to be accomplished *by unlawful means*. See, e.g., *Massey v. Armco Steel Company*, (Tex 1983), 652 S.W. 2d 932. Suppose, for  example, an agreement is sought by two unions to consolidate (a "lawful" end). It is still an unlawful conspiracy if such union entities seek to achieve such otherwise lawful end by threatening the lives of union members who have stated that they  will vote against consolidation.

The *actual* conspiracy that Plaintiffs allege in their lawsuit is that UIIS and Burns conspired to deprive Plaintiffs of their right to work and conspired to  violate Title VII (and note that conspiracy by two sequential employers is nowhere addressed in Title VII), and further conspired to violate the civil rights of immigration detainees by firing, or causing to be fired, guards who sought to protect such detainees. (Burns and UIIS were contractually bound to abide by federal laws - - see Exhibit C). But for such improper goals, UIIS would have had no reason *not* to hire all Plaintiffs.  What makes this case somewhat unique, is, of course, the fact that the unlawful agenda was that of the UIIS supervisors who had originally perpetrated the sexual harassment of Burns' female guards and, female detainees while such individuals  were Burns' supervisors.  As UIIS employees, however, the acts of these ex-Burns' supervisors clearly bound UIIS and made UIIS a conspirator. It is to be noted here that neither criminal law nor statutory violations are requisites of the law of civil conspiracy. Something as seemingly innocuous as the orchestrated expulsion of a member of a mutual benefit association is actionable as a civil conspiracy. See, *St. Louis & S.W. Railway Co. Of Texas v. Thompson* (Sup Ct. 1908) 113 S.W. 144.

Certainly, with respect to tortuous interference with contract *vis a vis UIIS*, Plaintiffs do not

contend that UIIS tortiously interfered with its own contract since cases like *John Masek Corp. v. Davis*, 848 SW 2d 170, 175 (Tex. App-Houston 1992, writ denied) have long recognized what seems inescapably logical. The tortuous interference claim is limited to Burns and is not a part of any conspiracy matrix. Burns is alleged to have tortuously interfered with the contract or prospective economic interests of Plaintiffs Urrutia, Hefner, and Rodriguez who allege that they were hired by UIIS and then fired because of Burns' efforts. The sweeping statements made by UIIS that "There is nothing in the common law which would prohibit UIIS from hiring whomever it chose or prohibit Burns from recommending for employment whomever it chose" are incorrect statements of the law and faulty statements of facts alleged. First, Plaintiffs allege that UIIS did hire them and, accordingly, statements about UIIS being able to *hire* "whoever it chose" are factually irrelevant. Such statements are also legally overbroad. Further the statement that there is nothing in the common law which would prohibit Burns from "recommending for employment whoever it chose" is also factually not relevant since Plaintiffs had already been hired by UIIS and then fired by UIIS because of Burns' input. There is simply no issue here of "recommendation" of future employment. What there is, instead, is a mean-spirited interference with *existing* employment perpetrated by supervisors whose goal was to continue to violate the civil rights of both female immigration detainees and female guards.

**b)**    **<u>Burns' Motion For Summary Judgment</u>**

Plaintiffs have previously addressed Burns' federal motion for summary judgment (incorporating therein all of Plaintiffs' previously-filed summary judgment responses and evidence) and here address only the reply brief dated January 25, 1999.

---

The Burns' reply again fails to confront the fact that Title VII makes no mention of protecting employees who complain about the sexual exploitation of immigrant detainees, nor about tortious interference by one employer vis a vis a subsequent employer's employees, nor about conspiracies between a former employer and a new employer.

As is true of UIIS efforts, the Burns' "preemption" argument is predicated on the unarticulated and false premise that Title VII (or any other federal or state statute for that matter) somehow covers anything that could ever happen in the employee/employer relationship. In fact, Title VII is of a very limited scope, singling out a handful of "discrimination" areas.

Burns' treatment of Plaintiffs' conspiracy claims continues with the assertion that conspiracy claims require "two or more persons". Again, here, there clearly are at least two or more entities - - Burns, UIIS, and Ramirez. With respect to the latter Defendant, it is to be observed that even two employees *of one company* can be guilty of a conspiracy notwithstanding the fact that each is paid by the same entity. Two disgruntled Burns' employees, one would guess, would surely be found guilty of a criminal conspiracy if they had agreed to blow up the federal courthouse and done some overt act towards that goal.

Burns also continues in its reply brief to claim that the "undisputed summary judgment evidence proves that Burns did noting to prevent Plaintiffs from getting hiring [sic] by United". Plaintiffs' affidavits, filed previously and incorporated in Plaintiffs' prior Burns's response, dispute that assertion, but more significantly, as Plaintiffs have pointed out before and cited cases on point, conspiracy has the innate idea of "secret." Conspirators like McVey and Nichols do not issue public statements of what they intend to do, and, when caught, do not sign statements saying "we did it."

Conspiracy cases, civil or criminal, are almost invariably proven up by circumstantial evidence, and as per the cases Plaintiffs have previously cited, conspiracy allegations are inherently inappropriate subjects for summary judgment.

Burns also rehashes the contract issue. Although Burns' policy manual *does not* say it is non-contractual (it is badly worded), more importantly the fact that part of such manual has a signature line for employees which purported to bind employees a waiver of the right to a jury (a highly un-American concept), clearly shows that Burns intended the manual to be *binding* i.e., "contractual." Because of these facts, Plaintiffs have previously cited most of the cases Burns has cited in this area. Finally, with respect to the negligence question, Plaintiffs reiterate that there is no allegation of "on the job injury," just the opposite in fact, an injury occurring after employment caused, in part, by negligent release of employee data.

Finally, as the record reflects, Plaintiffs have incorporated all of their prior summary judgment responses and evidence in their federal court responses. Overall, it seems highly unconscionable that Defendants can again file the same motions they previously filed in state court and which were denied there. There has already been a finding that summary judgment is inappropriate and Defendants' latest efforts certainly seem objectionable from the point of view of judicial resources.

c)    **Ramirez  Motion For Summary Judgment**

The Ramirez motion also attempts to revisit the same issues which were unsuccessfully asserted by all defendants in state court and again raised from the dead here by UIIS and Burns. Plaintiffs incorporate by reference here, all of their previously filed summary judgment responses

and evidence, and contemporaneously filed responses to UIIS and Burns' federal court motions.  To reiterate:

(1)   Title VII does not address conspiracies between sequential employers;

(2)   Title VII does not address the area of detainee rights discrimination;

(3)   Plaintiffs have alleged that Ramirez conspired to have Plaintiffs fired by UIIS. Absent a showing that Ramirez was dead at the time of the alleged conspiracy, or perhaps that Plaintiffs are fictional persons, there is no evidence, including those self-serving affidavit denials of Defendants, that is *capable* of serving as the basis of a summary judgment in a conspiracy case.  If this case were fifty years old there would be no direct evidence of conspiracy.  In this instant case, however, Plaintiffs come as close as any Plaintiff ever comes to direct evidence with the "blacklist."  All Plaintiffs affidavits clearly raise conspiracy issues.  The cases cited by Ramirez (e.g. *Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) and *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 435 (5th Cir. 1995) are not conspiracy cases. Plaintiffs allege that Ramirez was a supervisor, that Plaintiffs had frequently complained about his conduct and that he was involved in the conspiracy to get Plaintiffs fired by UIIS.  Proof of the conspiracy cannot come directly from Plaintiffs' mouths.  The aforementioned *circumstantial evidence*, set out in Plaintiffs' prior summary judgment evidence and pleadings, is a sufficient basis upon which to prove up the alleged conspiracy.  Circumstantial evidence is the hallmark of conspiracy cases. See, generally, *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*

(Tex. 1968) 435 S.W. 2d 854;     *Perryco v. FDIC* (Tex. App. El Paso 1989) 777

S.W. 2d 549; *Kirby v. Cruce* (Tex. App. Dallas 1985) 688 S.W. 2d 161, writ ref'd

n.r.e.


For all of the foregoing reasons, the summary judgment motions of all Defendants should be

denied just as the same motions were previously denied in state district court.

Respectfully submitted,

Denis A. Downey
State Bar 06085500
Federal I.D.  1186
1185 FM 802, Suite 3
Brownsville, Texas 78521
956 544-0561 / 956 544-0562 (FAX)

ATTORNEY FOR PLAINTIFFS

## SETTLEMENT AGREEMENT AND RELEASE

It is HEREBY AGREED by and between BPS Guard Services, Inc. d/b/a
Burns International Security Services ("Burns") and Anthony L. Hefner
("Hefner"):

WHEREAS, Burns employs Mr. Hefner at its INS job site in Texas, and

WHEREAS, Mr. Hefner filed a charge of discrimination with the Equal
Employment Opportunity Commission ("EEOC") (Charge No. 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), and

WHEREAS, the EEOC filed a complaint in the United States District
Court for the Southern District of Texas (Civil Action No. B-88-128),
and

WHEREAS, the EEOC alleged in said complaint that Burns
discriminated against Mr. Hefner on account of his national origin, and

WHEREAS both Burns and Mr. Hefner wish to resolve all disputes
between them now and for all time without further proceedings in any
forum whatsoever,

NOW, THEREFORE, in consideration of the mutual promises, covenants
and agreements set forth herein, Burns and Mr. Hefner hereby agree as
follows:

EXHIBIT
A

1.    Burns agrees to pay Mr. Hefner as wages Eighteen Thousand
Dollars ($18,000.00) within thirty (30) days of its receipt of an
executed original copy of this Agreement at its corporate offices in
complete satisfaction for any and all claims now existing between them,
including any and all claims for attorney's fees and expenses.

2.    Mr. Hefner agrees that Burns shall deduct all federal, state
and local taxes from the above amount as appropriate.

3.    Mr. Hefner does hereby release and forever discharge Burns and
its present, past and future officers, directors, employees, agents,
owners, subsidiaries, divisions, affiliates, predecessors, successors
and assigns and all other persons who are or may be liable personally
and/or in their representational capacity, of and from any and all
claims, demands, actions or causes of action whatsoever, in law or in
equity, that he, his heirs, executors, administrators, successors and
assigns ever had, now have or hereafter can, shall or may have, based
on, arising from, or in any way related to his employment with Burns or
the prior separation therefrom, including but not limited to the
allegations set forth in the aforesaid complaint, and further including
without limitation, claims for damages of whatever nature, including
attorney's fees and expenses, directly or indirectly related to or
arising out of the foregoing.

-2-



September 23, 1990

Dear Rev. Anthony L. Hefner,

    I seen you on the 22nd. of May.  I pointed out to you a young girl that was seventeen years old.  Her name is Lopez Mejia Juana Licida # 70-407-268.  As a female officer I had to escort this detainee to Building 9, at lest 4 or 5 times in one day.  She told me that she had to dance the Lambara and do other things for the I.N.S. Supervisors.  One of the supervisors told her that they were going to get her out the next day.

    I trust that my name will not be reveal until the right time.

Thank you,

*Cynthia Rodriguez*



37.  RECREATION PROGRAM

All recreational programs will be supervised by a guard and/or
recreation specialist.  All recreation materials will be issued
and accounted for by a guard and/or recreation specialist.

38.  MEDICATION

Medications are restricted to those items from the health unit in
envelopes bearing the identification of the contents, name and
number of the person to whom it is issued and date of issue.

39.  QUARTERS AND CONVALESCENCE STATUS

Quarters means that the detainee, because of illness or injury,
is confined to his bed in his unit except to go to meals, sick
call, religious services and visits.

Convalescence status is generally less restrictive than
quarters.  Generally detainees on convalescence are not confined
to the unit and may go to various areas.  All detainees on
quarters and convalescence are accounted for by the unit guard in
the same manner as he/she accounts for all other detainees.

F.  POLICIES AND GUIDELINES

1.  PRE-PERFORMANCE MEETING

Immediately, after contract award, the successful contractor is
required to meet with the COTR.  The time and place of the
meeting will be arranged with the COTR.

2.  REGULATIONS

Immigration and Naturalization Service rules, regulations and
related procedures will be enforced by the Contractor as a part
of this contract.  The contractor shall also comply with full
rules and regulations governing public buildings and grounds, and
shall consult, enforce, and comply with such other rules and
regulations to include any changes which the Government in its
discretion hereafter may adopt for the said premises.  (All
regulations issued by INS which are provided to the contractor
through the COTR are to become a part of the contract and will be
in effect.)

Rules and Regulations Governing Public Buildings and Grounds,
FPMR, 41 CFR 101-20.3, are applicable to all persons entering in
or on such property, including the contractor, his agents and
employees.

The contractor shall not use, or permit to be used, the
Government premises for any unlawful purpose, or permit any
unlawful acts in or upon the Government premises.

The contractor shall make no modification to the Government
premises without the express and written prior consent of INS.


EXHIBIT
C

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent this 4th day of June, 1999, via the U.S. Mail, first class, postage prepaid, to the following:

Richard R. Rodriguez
RODRIGUEZ & RODRIGUEZ
1117 East Harrison Street
Harlingen, Texas 78550

Robert Whittington
SANCHEZ, WHITTINGTON,
JANIS & ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521-2257

Laura J. Urbis
RODRIGUEZ, COLVIN & CHANEY, L.L.P.
1201 East Van Buren
P.O. Box 2155
Brownsville, Texas 78522

Nancy L. Masso
Assistant U.S. Attorney
P.O. Box 1671
Brownsville, Texas 78522

_____

Denis A. Downey